CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

2/20/2024

LAURA A. AUSTIN, CLERK
BY: s/ ARLENE LITTLE
       DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| TIMOTHY W.,[1] ) | |
| ) | Civil Action No. 6:22-cv-00047 |
| Plaintiff, ) | |
| v. ) | REPORT & RECOMMENDATION |
| ) | |
| MARTIN O'MALLEY,[2] ) | By: C. Kailani Memmer |
| Commissioner of Social Security, ) | United States Magistrate Judge |
| ) | |
| Defendant. ) | |

Plaintiff Timothy W. ("Timothy") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for supplemental security income ("SSI") under the Social Security Act ("Act"). 42 U.S.C. §§ 1381–1383f. Timothy alleges that the Administrative Law Judge ("ALJ") erred by crafting a residual functional capacity ("RFC") with an illegally impermissible restriction, failing to properly assess Timothy's adjustment disorder and clinically diagnosed anxiety, crafting an RFC that fails to account for Timothy's limitations in ability to interact appropriately with the general public, and failing to explain how Timothy can frequently handle objects with his left hand.

This matter is before me on referral under 28 U.S.C. § 636(b)(1)(B), dated October 10, 2023. ECF No. 18. Having considered the administrative record, the parties' filings, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence.

---

[1] Due to privacy concerns and because social security opinions often contain intensely personal medical information about claimants, I use only the first name and last initial of the claimant in such opinions.
[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin O'Malley should be substituted for Kilolo Kijakazi as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

For the reasons detailed below, I respectfully recommend that the presiding District Judge **GRANT** Timothy's Motion for Summary Judgment, ECF No. 12; **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 15; and **REMAND** this case for further proceedings.

## STANDARD OF REVIEW

The court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Timothy failed to demonstrate that he was disabled under the Act.[3] *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). While substantial evidence is a somewhat deferential standard, the Court does not "reflexively rubber-stamp an ALJ's findings." *Lewis v. Berryhill*, 858 F.3d 858, 870 (4th Cir. 2017).

"In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176 (quoting *Craig v. Chater*, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period for not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work; instead, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. *See* 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. *Hays v. Sullivan*, 907 F. 2d 1453, 1456 (4th Cir. 1990).

In contrast, remand is appropriate if the ALJ's analysis is so deficient that it "frustrate[s] meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (noting that "remand is necessary" where the court is "left to guess [at] how the ALJ arrived at his conclusions"). The ALJ must sufficiently articulate her findings such that the district court can undertake meaningful review. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

## CLAIM HISTORY

On May 21, 2020, Timothy filed for SSI pursuant to Title XVI of the Act, alleging disability as of August 21, 1984, because of a learning disability, neurological deformities of the left hand, adjustment disorder, and anxiety. R. 97, 107, 232. The claim was denied initially on December 11, 2020, and upon reconsideration on April 6, 2021. Timothy then filed a written request for a hearing. On September 23, 2021, ALJ L. Raquel BaileySmith conducted a hearing by telephone due to the extraordinary circumstances presented by the COVID-19 pandemic. R. 39–66. Counsel represented Timothy at the hearing, which included testimony from vocational expert Cecelia Thomas. R. 42. On October 5, 2021, the ALJ entered her decision analyzing Timothy's claims under the familiar five-step process[4] and issuing an unfavorable decision denying Timothy's claim for benefits. R. 15–34.

---

[4] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform any other work. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (per curiam) (citing 20 C.F.R. § 404.1520); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proofs at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to

At step one, the ALJ found that Timothy had not engaged in substantial gainful activity since May 21, 2020. R. 18. At step two, she found that Timothy has the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the left knee, learning disorder/borderline intellectual functioning ("BIF"), limited left wrist and hand mobility, and scoliotic thoracolumbar curvature of the spine. R. 18.

At step three, the ALJ found that Timothy's impairments, either individually or in combination, did not meet or equal a listed impairment. R. 20–25. The ALJ specifically considered Listings 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root, 1.16 (lumbar spinal stenosis resulting in compromise of cauda equina), 1.18 (abnormality of a major joint in any extremity), and 12.05 (intellectual disorders). R. 20–22.

The ALJ concluded that Timothy has the RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b). [Timothy] is able to frequently balance, and occasionally stoop, kneel, crouch, crawl and climb ramps stairs [sic], but never climb ladders, ropes or scaffolds. He is able to frequently handle, occasionally push and/or pull, operate hand controls, and finger with the left non dominant hand. The claimant may have no more than occasional exposure to extreme cold, vibration, or exposure to heights or hazards. He is able to understand, remember, apply and carry out simple routine tasks consistent with unskilled work that is learned through demonstration as opposed to reading instructions. [Timothy] is able to concentrate, persist and maintain pace to complete unskilled tasks that do not require production rate pace, meaning fast pace.

R. 25.

At step four, the ALJ found that Timothy had no past relevant work. R. 32. Finally, at step five, the ALJ relied on the VE's testimony to find that given his vocational profile and RFC, Timothy could perform work existing in significant numbers in the national economy, including the representative light, unskilled jobs of cleaner, housekeeping, cafeteria attendant, or marking

---

establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimants age, education, work experience, and impairments, to perform available alternative work in the national economy. 42 U.S.C. § 423(d)(2)(A); *Taylor v. Weinberger*, 512 F.2d 664, 666 (4th Cir. 1975).

clerk. R. 32–34. Overall, then, the ALJ found that Timothy was not disabled within the meaning of the Act. R. 34. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Timothy's request for review on June 27, 2022. R. 1–6.

## ANALYSIS

The issues in this case are as follows: (1) does substantial evidence support the ALJ's RFC which states that "the claimant is able to concentrate, persist, and maintain pace to complete unskilled tasks that do not require production rate pace, meaning fast pace"; (2) does substantial evidence support the ALJ's evaluation of Timothy's mental impairments given the state agency prior administrative medical findings ("PAMFs") and the lay witness statement of Timothy's counselor, Shelley Mays-Couch; (3) does substantial evidence support the ALJ's evaluation of Timothy's ability to interact with others; and (4) does substantial evidence support the ALJ's evaluation of Timothy's left arm impairment and ultimate finding that Timothy could frequently handle with the left nondominant extremity.

### A. Medical History Overview

Timothy was born on May 4, 1984. R. 96. He reportedly suffered a middle ear infection at seven weeks old. R. 309.

On August 25, 1984, three months after Timothy's birth, he was admitted to the Emergency Department at State University Hospital in Syracuse, New York for several health issues, including H-flu meningitis, subdural effusion, macrocephaly, anemia, thrombocytopenia, seizures, and heart murmur. R. 311. On admission, Timothy's mother reported that Timothy's breathing was noisy and fast, and that he had watery, mucous stool, and that his color became pale and he became lethargic. R. 304.

On October 27, 1986, Christine Byke, M.D., of the College of Medicine at State University of New York, wrote a letter in support of compassionate reassignment for Timothy's father, who was in the military. R. 312. In that letter, Dr. Byke states that Timothy, then 29-months old, had "left hemiparesis, macrocephaly, and moderately severe developmental delay," which were caused by the hemophilus influenza type b meningitis with subdural effusion that Timothy suffered at three months old. *Id.* Dr. Byke further explains that Timothy was receiving "vigorous therapies," including both physical, occupational, and speech therapy several days a week. *Id.*

In 2002, when Timothy was an 18 year old senior in high school, he was referred to the Postsecondary Education/Rehabilitation Transition program ("PERT") at the Woodrow Wilson Rehabilitation Center in Fishersville, Virginia. R. 313–322. The purpose of the referral was to identify a vocational goal for Timothy and reasonable accommodations as needed. R. 313. In his initial interview for PERT, Timothy indicated that his goal was to find a job, but that he had no previous work experience; nevertheless, he indicated interest in child care, mechanics, and business. R. 314. He stated that he wanted to be a bus driver. *Id.* In the "Summary of Assessments," the report noted that Timothy's work behavior strengths were "attendance/punctuality, appearance, cooperation/team work, work energy/stamina, and work tolerance/persistence." *Id.* His work behaviors needing improvement or which interfered with his performance were "attention to task/concentration, ability to accept supervision feedback, safety awareness and practices, care with materials/property, initiative and dependability, follows instructions/demonstrations, attention to detail/quality work, and meets work schedules." R. 315.

PERT determined that Timothy was unable to demonstrate vocational potential for child care, therapy aide, or automotive. *Id.* He demonstrated difficulty with "independent judgment,

6

immature behavior in the work area, a need for high levels of supervision, difficulty focusing on some tasks, and limited manual dexterity." *Id.* As part of PERT, Timothy participated in ancillary health screenings provided by therapists in physical therapy, occupational therapy, and communication services. R. 317. As a result of those screenings, Timothy was referred for an Occupational Therapy Driving evaluation and a Communication Services audiology evaluation. *Id.* The driving evaluation showed that Timothy was questionable for obtaining his driver's license because of concerns regarding visual perception, visual-perceptual processing time, and alternating his attention on various aspects of basic driving skills. *Id.* He was noted to be an inexperienced driver. *Id.*

The audiological evaluation indicated that Timothy had moderate unilateral sensorineural hearing loss in his right ear and normal hearing in his left ear. *Id.* In a life skills assessment, Timothy demonstrated "some strength" in "appropriate communication skills, problem solving, measurement, safety awareness, money management, community resource information and job seeking and keeping skills." R. 318. Throughout PERT, the report indicates that "Timothy maintained good relations with PERT peers and was characterized as easy going . . . [and] had a good relationship with his roommate," however, he "sometimes acted in an immature and impulsive manner." R. 319. Overall, Timothy "demonstrated vocational potential in the for [sic] training in WWRC's Stock Checker I program," and alternatively could be placed in coaching for the following positions: laborer (stores); grocery packer; hand packager; material handler; warehouse worker; and lumbar yard worker. *Id.*

On August 26, 2005, Timothy was referred to Susan Eick, Psy.D., a licensed clinical psychologist, for an assessment to determine Timothy's eligibility for Mental Retardation Waiver services. R. 342–47. In Dr. Eick's assessment, she recounted Timothy's background,

7

including the history of sexual abuse that Timothy endured as a child. R. 342. Timothy was continuing to grapple with the trauma from that experience. R. 343. During the assessment, Dr. Eick noted that Timothy "appeared shy; smiling and pulling his hat down over his face briefly when embarrassed or challenged." R. 344. The quality of Timothy's speech was impaired, and Dr. Eick noted he was readily understandable "65% of the time and could be understand 90% of the time with great effort by the listener." *Id.*

Dr. Eick assessed Timothy's adaptive functioning using the Adaptive Behavior Scale – Residential and Community – Second Edition ("ABS-RC:2"). R. 344. Timothy's scores were as follows: Independent functioning: superior; physical development: average; economic activity: average; language development: above average; numbers and time: superior; social behavior: very poor; conformity: below average; trustworthiness: below average; stereotyped, hyper behavior: above average; sexual behavior: below average; domestic activity: above average; prevocational activity: below average; self-direction: average; responsibility: average; socialization: average; self-abusive behavior: above average; social engagement: average; disturbing interpersonal behavior: poor; personal self-sufficiency: superior; community self-sufficiency: above average; personal social responsibility: average; social adjustment: poor; personal adjustment: average.. R. 344–45.

Dr. Eick noted that social adjustment, interpersonal behavior, and vocational activity were particular weaknesses for Timothy. R. 345. WAIS-III, a comprehensive measure for assessing intellectual aptitude, indicated that Timothy had a verbal IQ score of 74, performance IQ of 72, and full scale IQ score of 70. *Id.* Dr. Eick noted that Timothy's full scale IQ score "falls at the bottom of the range for a diagnosis of Borderline Intellectual Functioning and at the

top of the range for Mild Mental Retardation." *Id.* Dr. Eick noted that Timothy was currently diagnosed with Borderline Intellectual Functioning. R. 346.

Overall, Dr. Eick stated in her recommendations that Timothy, "needs assistance in many areas . . . [and] would do well to have education and assistance regarding hygiene and caring for his property, socially appropriate behavior when interacting with others, anger management, maintaining appropriate boundaries with others and sexually appropriate behavior." *Id.*

### B. The ALJ Did Not Err by Crafting an RFC With Restrictions Against "Production Rate Pace, Meaning Fast Pace."

Timothy first argues that the ALJ erred when she crafted an RFC which states that Timothy "is able to concentrate, persist and maintain pace to complete unskilled tasks that do not require production rate pace, meaning fast pace." ECF No. 13 at 3. Timothy cites to the Fourth Circuit's decision in *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), which forbids an RFC that contains a restriction against "work requiring a production rate or demand pace," where the ALJ fails to provide enough information to understand what those terms mean. *Thomas*, 916 F.3d at 311–12. The Commissioner correctly points out that the ALJ's decision in *Thomas* contained several other flaws that further frustrated the Court's ability to conduct a meaningful review.

While Timothy is correct that the Fourth Circuit has held that the use of the term "production rate" in an RFC without further definition of that term warrants remand, the ALJ did provide explanation of what she considered the meaning of "production rate" in this case. Specifically, the ALJ defined "production rate pace" as "meaning fast pace." R. 25.

Timothy cites to several authorities where the Commissioner's final decision was remanded for the use of "production rate" or similar language without adequate definition. First, Timothy cites to *Susan M. v. Kijakazi*, 2021 WL 4267325 (D. Md. 2021), where the ALJ

9

restricted the claimant to SSRT "with no fast pace, no production rate requirements," *Id.* He cites to *Da'Quan E. v. Saul*, 2021 WL 1164225 (D. Md. 2021), in which the court remanded where the ALJ failed to define the meaning of the term, "fast pace or strict production quotas." He next cites to *Christopher M. H. v. Comm'r, Soc. Sec. Admin.*, 2020 WL 2556563 (D. Md. 2020), where the court remanded where the RFC contained a restriction against "fast-paced production work." Lastly, he cites to *Sharon H. v. Saul*, 2020 WL 6281610 (W.D. Va. 2010), where the court overruled the Commissioner's objection to remand where the ALJ did not explain his finding that the claimant could perform unskilled tasks "in a low stress work environment with low stress defined as no strict production quotas."

This case is distinguished from the above-cited cases because the ALJ in this case expressly defines "production rate pace" as meaning "fast pace." R. 25. In *Susan M.*, the ALJ did not provide any "linking language" between "production rate" and "fast pace," suggesting that those might be two separate terms. *See Susan M.*, 2021 WL 4267325, at *1. In *Da'Quan*, the RFC limited the claimant to work "without fast pace or strict production quotas," where "fast pace" is a modifier of "production quotas" rather than a definition. *See Da'Quan*, 2021 WL 1164225, at *2. Similarly, in *Christopher M. H.*, the ALJ used the term, "fast-paced production work," where the term "fast-paced" modifies the term "production work," rather than defines it. *See Christopher M. H.*, 2020 WL 2556563, at *4. Lastly, the ALJ's error in *Sharon H.* concerned a restriction of "no strict production quotas," without further explanation. *See Sharon H.*, 2020 WL 6281610, at *4. The RFC in this case does not contain "production quota" language, and as stated above, the term "production rate" is defined as "fast pace." R. 25.

Therefore, the ALJ did not err in this case by crafting an RFC that contained a restriction against "production rate pace, meaning fast pace."

### C. The ALJ's Evaluation of Timothy's Mental Impairments Is Not Supported by Substantial Evidence

Timothy next argues that the ALJ erred by failing to properly assess his adjustment disorder and clinically diagnosed anxiety as a result of the ALJ's failure to properly weigh the statements of Shelly Mays-Couch, who was Timothy's counselor. ECF No. 13 at 6.

Evidence throughout the record supports a finding that Timothy was diagnosed with adjustment disorder. *See* R. 98, 99, 100, 104, 107, 108, 109, 406, 407, 409, 420, 421, 436, 438. Yet as Timothy correctly points out, the ALJ never refers to Timothy's diagnosis for adjustment disorder other than to note that Timothy indicated he was unable to work because of that impairment. The ALJ neither found Timothy's adjustment disorder to be severe nor non-severe. It is unclear how, if at all, Timothy's documented diagnosis of adjustment disorder factored in to the ALJ's findings and conclusions.

The Commissioner argues that "a mere 'reference' to anxiety or depression is insufficient for Plaintiff to show that it was a severe impairment, and, in any event, the ALJ fully evaluated Plaintiff's mental conditions, regardless of the names given to the impairments." ECF No. 16 at 19. I am not persuaded by this argument. As noted above, the ALJ never discussed Timothy's adjustment disorder or its impact on Timothy's RFC, and it is evident from the record that adjustment disorder is one of the mental impairments with which he was diagnosed. While the Commissioner argues that the regulations do not provide for the use of diagnosis to establish the existence of an impairment, it is unclear from the record why the ALJ did not consider Timothy's adjustment disorder diagnosis, or whether she was even aware of it. This court is left only to guess at how, if at all, the ALJ weighed Timothy's adjustment disorder.

Additionally, the Commissioner's statement that, "the ALJ fully evaluated Plaintiff's mental conditions, regardless of the names given to the impairments," is troubling. If an ALJ

11

considered a claimant's diabetes but not her total blindness, then the Commissioner could not in good faith argue that that ALJ fully evaluated that claimant's <u>physical</u> conditions, regardless of the names given to the impairments. Timothy has a well-established diagnosis of adjustment disorder, thus the ALJ should have expressly addressed that diagnosis in her findings. However, the ALJ failed to do that on the record, and instead mentioned it only once and only in relation to Timothy's claimed impairments. Meaningful review is frustrated as the court can only speculate as to how the ALJ arrived at Timothy's limitations and how, if at all, an express consideration of Timothy's adjustment disorder might have altered those limitations.

Therefore, the ALJ's evaluation of Timothy's mental impairments is not supported by substantial evidence, and this court is left to guess at how, if at all, the ALJ considered Timothy's documented impairments, namely his adjustment disorder and anxiety, in coming to her conclusions. As such, remand is appropriate.

### D. The ALJ's Evaluation of Timothy's Ability to Interact with Others is Supported by Substantial Evidence

Timothy next argues that the ALJ erred by crafting an RFC that fails to accommodate Timothy's limitations in ability to interact appropriately with the general public. ECF No. 13 at 11.

Particularly, Timothy argues that the available evidence does not support the ALJ's finding that Timothy has only "mild difficulties" in interacting with others. R. 24. For example, Timothy argues that while the ALJ pointed out that Stephen Saxby, Ph.D., noted that Timothy would not be able to legally interact with individuals under the age of 18, the ALJ ignored the Dr. Saxby's finding that Timothy's ability to interact appropriately with the general public is "moderately limited." R. 115. Specifically, Dr. Saxby stated that, "[Timothy's] psychological [symptoms] would create restrictions in [his] ability to interact with supervisors, coworkers, or

12

the public for extended times, but [he] would be able to interact with these groups to an appropriate degree for at least two hours in an eight-hour workday." *Id.*

The Commissioner first argues that there is substantial evidence in the record to support a finding that Timothy has only mild limitations in interacting with others. He next argues that the ALJ considered Dr. Saxby's findings and considered them only partially persuasive. Lastly, the Commissioner argues that the ALJ limited Timothy to unskilled work, which inherently minimizes the level of interaction with others, as unskilled work generally involves working with things and not with people. *See* 20 C.F.R. pt. 404, subpt. P. App. 2., §§ 201.10(i), 202.00(g).

First, while the ALJ does not directly address Dr. Saxby's opinion that Timothy has moderate limitations in interacting with others, the ALJ does address Dr. Saxby's assessment of Timothy and finds it to be "not fully supported by the medical evidence of record." R. 30. While Timothy may disagree with the ALJ's credibility determination relating to Dr. Saxby's opinion, it is not the duty of this court to "re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176. The ALJ articulated a clear rationale to explain why she found Dr. Saxby's opinion to not be supported by the evidence.

In making her findings on Timothy's limitations in interacting with others, the ALJ relied upon several pieces of evidence throughout the record: Timothy had friends while in prison; lives in a group home; interacts with housemates; plays basketball weekly; and acted as a mentor while in prison. R. 22. Additionally, Timothy reported he could function appropriately in grocery stores, doctors' offices, and other facilities, R. 24. Furthermore, in the administrative hearing held on September 23, 2021, Timothy stated that he goes to visit other residents of the house where he lives, and that if there were group activities in that house, then he would participate in

13

every one. R. 54. These facts are supported by evidence throughout the record. *See* R. 45–46, 51–52, 54, 276, 414, 447.

Therefore, I conclude that substantial evidence supports the ALJ's evaluation of Timothy's ability to interact with others.

### E. The ALJ's Evaluation of Timothy's Left Arm Impairment

Lastly, Timothy argues that the ALJ erred by failing to explain how Timothy can "frequently" handle objects with his left hand. ECF No. 13 at 14.

Timothy points out that the record shows that since he was an infant, he has had physical impairment of his left arm and hand caused by meningitis. ECF No. 13 at 14. Timothy argues that while the ALJ noted that Timothy has "limited left wrist and hand mobility," R. 18, Timothy's RFC states that "he is able to frequently handle . . . with the left nondominant hand." R. 25. Timothy argues that the ALJ fails to explain how she arrived at her conclusions, and that the ALJ failed to explain why she favored the opinion of Robert McGuffin, M.D., a non-examining Disability Determination Services ("DDS") physician, over the opinions of Jack Hutcheson, M.D., another non-examining DDS physician, and Brittney Blowe, NP, a consultative examiner. Dr. Hutcheson opined that Timothy was limited to occasional handling with the left upper extremity. R. 113. Nurse Blowe concluded that Timothy could never reach with the left extremity and could only occasionally handle, feel, and grasp with the left hand. R. 456.

At the September 23, 2021, hearing, the ALJ asked the vocational expert about a hypothetical person who can only "occasionally reach, handle, and finger with the left, nondominant upper extremity," and the vocational expert testified that there would be no work available for such an individual. R. 62. The vocational expert affirmed that it was the limitation

14

to "occasional" reaching, handling, and fingering with the left, nondominant extremity that was work preclusive. R. 62–63. Thus, the ALJ was or should have been aware about the importance of the distinction between whether Timothy was limited to "frequent" handling with the left nondominant hand or "occasional" handling with the left nondominant hand.

Given that the record shows that two separate medical providers opined that Timothy was limited to occasional handling, that Dr. McGuffin based his opinion on that of one of those providers, Nurse Blowe, and that the difference between "frequent" and "occasional" handling was determinative on whether there were other jobs in the economy that Timothy could perform, one would expect some robust explanation about how the ALJ came to her conclusions. There is no such explanation in this case. Furthermore, the ALJ fails to discuss the persuasiveness of Dr. Hutcheson's opinion that Timothy could only occasionally handle with the left, nondominant extremity. While the Commissioner argues that the ALJ did evaluate the persuasiveness in the second full paragraph at R. 30, I cannot determine exactly what the Commissioner is referring to. This Court is left only to guess at why the ALJ crafted an RFC that restricted Timothy to "frequent handling" with his left, nondominant extremity, rather than "occasional handling" with that extremity.

Therefore, there is not substantial evidence to support the ALJ's evaluation of Timothy's left arm impairment. As such, and because this Court is left to guess how the ALJ arrived at her conclusions, remand is appropriate. *Mascio,* 780 F.3d at 636.

## CONCLUSION

For the foregoing reasons, I respectfully **RECOMMEND** that an order be entered **GRANTING** Timothy's Motion for Summary Judgment, ECF No. 12; **DENYING** the

15

Commissioner's Motion for Summary Judgment, ECF No. 15; and **ORDERING** the case to be remanded for further evaluation in accordance with the law.

## NOTICE TO PARTIES

The clerk is directed to transmit the record in this case to Robert S. Ballou, United States District Judge, and to provide certified copies of this Report and Recommendation to counsel of record.

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party must serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered: February 20, 2024

*C. Kailani Memmer*
C. Kailani Memmer
United States Magistrate Judge